**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **RUI CHEN AND WENJIAN GONZALES,** | **Case No.: 18-CV-3771 YGR** |
| **Plaintiffs,** | **ORDER DENYING MOTIONS TO COMPEL ARBITRATION** |
| **vs.** | **DKT. NOS. 39, 46** |
| **PREMIER FINANCIAL ALLIANCE, INC.** *et al.*, | |
| **Defendants.** | |

Defendants Premier Financial Alliance Inc. ("PFA") and David Carroll have filed their Motion to Compel Arbitration and Dismiss Claims, asserting that the claims of plaintiffs Wenjian Gonzalez[1] and Rui Chen should be compelled to arbitration under the Federal Arbitration Act, 9 U.S.C. § 2 *et seq*. (Dkt. No. 39.) Defendants A JW Production, LLC, Bill Hong, The Consortium Group, LLC, Jack Wu, Rex Wu, and Lan Zhang filed a separate Motion to Compel Arbitration asserting that plaintiffs' related claims against them should be compelled to arbitration based upon the existence of an arbitration agreement between plaintiffs and PFA. (Dkt. No. 46). Having carefully considered the papers submitted in support of and in opposition to the motions, and the admissible evidence therein,[2] and for the reasons set forth below, the Court hereby **DENIES** the Motions on the grounds that defendants have failed to establish the existence of an agreement to arbitrate.

---

[1]  The Court notes that the spelling of plaintiff's name appears differently on different filings. The Court adopts the spelling plaintiff appears to have used to register with Premier Financial Alliance Inc.

[2] Plaintiffs object to the declaration of Steven Early (Dkt. No. 40) as hearsay and contrary to the best evidence rule. Plaintiffs contend that defendants' failure to offer better evidence within their control should result in an adverse inference. The Court finds the objections well taken. For these reasons, and the others stated herein, the Court finds the Early declaration insufficient to establish that plaintiff Gonzalez assented to the arbitration agreement.

# I. BACKGROUND

PFA is in the business of selling life insurance through licensed life insurance agents termed "Associates." Plaintiffs herein allege that they joined PFA as "Associates" around 2017 or 2018. (First Amended Complaint ["FAC"], Dkt. No. 28, ¶¶ 74, 76.)[3]

Defendants offer the declaration of Steven Early, an attorney for PFA who has "assisted and prepared, in the normal course of business" the AMA. (Early Decl. ¶¶ 1, 4.) Early attests that, in order for an individual to become an "Associate" with PFA, they must execute an Associate Marketing Agreement ("AMA") by electronically signing it on PFA's website, and that the software utilized by PFA will not allow associates to join PFA without providing an electronic signature on the AMA. (*Id.* ¶¶ 5, 6, 7.) Section 2 of the AMA provides as follows:

> 2. Covenants of the Associate
> The Associate agrees not to represent himself as an employee, owner, partner or agent of PFA . . . .The Associate agrees that he will not represent PFA membership as a business opportunity nor will he represent that PFA members will be compensated based on the number of persons they recruit to join PFA. The Associate agrees to be solely responsible for payment of all federal, state and local taxes based on business, sales or income obtained under this agreement. (This includes, but is not limited to, income taxes, payroll taxes, self-employment taxes, unemployment taxes, sales taxes, franchise taxes, intangible taxes and personal property taxes.) **The Associate agrees not to institute any legal proceedings against PFA; but, instead, shall submit any and all disputes with PFA, its officers, directors, employees and associates to binding arbitration pursuant to the rules of the American Arbitration Association.** The Associate agrees to comply with all policies, procedures, rules, regulations and guidelines of PFA and of all of its affiliated insurance companies with whom the Associate may be appointed under PFA. The Associate agrees not to use any advertising or promotional material other than those provided or approved by PFA or its affiliated insurance companies. The Associate agrees not to share or pay any insurance commissions to PFA recruits before they are licensed.

(Early Decl. Exh. A at 7-8, emphasis supplied.) Early attaches to his declaration a copy of plaintiff Wenjian Gonzales' "Agent Profile page" as well as a copy of the AMA. (*Id.* Exh. A.) Defendants

---

[3] According to PFA's records, plaintiff Wenjian Gonzalez electronically executed the AMA on January 19, 2018. (Early Decl. ¶ 11, Exh. A.) PFA has no record of plaintiff Rui Chen executing the AMA. (*Id.* ¶ 12.)

do not offer, through the Early declaration or otherwise, evidence of how the AMA or the Associate

registration form appears on the PFA website.[4]

## II. LEGAL FRAMEWORK

The Federal Arbitration Act (the "FAA") requires a district court to stay judicial

proceedings and compel arbitration of claims covered by a written and enforceable arbitration

agreement. 9 U.S.C. § 3. A party may bring a motion in the district court to compel arbitration. 9

U.S.C. § 4. The FAA reflects "both a 'liberal federal policy favoring arbitration' and the

'fundamental principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v.*

*Concepcion*, 563 U.S. 333, 339 (2011); *Mortensen v. Bresnan Commuc'ns, LLC*, 722 F.3d 1151,

1157 (9th Cir. 2013) ("The [FAA] . . . has been interpreted to embody "'a liberal federal policy

favoring arbitration.'"). The FAA broadly provides that an arbitration clause in a contract involving

a commercial transaction "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Once a court

is satisfied the parties agreed to arbitrate, it must promptly compel arbitration. 9 U.S.C. § 4.

In ruling on the motion, the Court's role is typically limited to determining whether: (i) an

agreement exists between the parties to arbitrate; (ii) the claims at issue fall within the scope of the

agreement; and (iii) the agreement is valid and enforceable. *Lifescan, Inc. v. Premier Diabetic*

*Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "[I]f there is a genuine dispute of material fact as

to any of these queries, a [d]istrict [c]ourt should apply a 'standard similar to the summary

judgment standard of Fed.R.Civ.P. 56.'" *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172,

1175 (N.D. Cal. 2012) (quoting *Concat LP v. Unilever, PLC,* 350 F.Supp.2d 796, 804 (N.D. Cal.

2004)); *see also Starke v. SquareTrade, Inc.*, No. 17-2474-CV, 2019 WL 149628, at *1 (2d Cir.

Jan. 10, 2019) (same). "If the parties contest the *existence* of an arbitration agreement, the

presumption in favor of arbitrability does not apply." *Goldman, Sachs & Co. v. City of Reno*, 747

F.3d 733, 742 (9th Cir. 2014).

---

[4] The Court notes that Federal Rule of Evidence 902 permits authentication of webpages by certification of a qualified person if such person "describes the process by which the webpage was retrieved" under penalty of perjury. Fed. R. Evid. 902, Advisory Committee Notes to 2017 Amendments at ¶ 5. No such evidence was presented here.

1    "'Before a party to a lawsuit can be ordered to arbitrate . . . there should be an express,

2    unequivocal agreement to that effect.  Only when there is no genuine issue of fact concerning the

3    formation of the agreement should the court decide as a matter of law that the parties did or did not

4    enter into such an agreement.'"  *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d

5    1136, 1141 (9th Cir. 1991) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51,

6    54 (3d Cir. 1980)).  In deciding whether there is a genuine issue of fact concerning formation of an

7    agreement, the party opposing arbitration shall receive "the benefit of all reasonable doubts and

8    inferences." *Id.*  "When deciding whether the parties agreed to arbitrate a certain matter . . . courts

9    generally . . .  should apply ordinary state-law principles that govern the formation of contracts."

10   *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Under California law, contract

11   formation requires mutual assent.  *See Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850

12   (1999).[5]

13   **III.    DISCUSSION**

14   Defendants have failed to meet their burden to show, by undisputed material facts, that the

15   parties entered into an agreement to arbitrate the claims here.  The Ninth Circuit in *Nguyen*

16   described contracts formed through internet websites as generally taking on one of two forms:

17   "clickwrap" or "click-through" agreements, in which website users are required to click on an 'I

18   agree' box after being presented with the terms of an agreement, and "browsewrap" agreements in

19   which the terms of the agreement are posted on the website and indicate that the user is agreeing to

20   the terms simply by continuing to use the website. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171,

21   1175–76 (9th Cir. 2014).  Courts will enforce clickwrap-type agreements where the user indicates

22   actual notice of the terms of the agreement or was required to acknowledge the terms of the

23   agreement before proceeding with further use of the site. *Id.* at 1776-77.  Enforcement of a

24

25       [5]  Defendants contend that Georgia law applies to the agreement here.  Georgia law similarly
requires mutual assent in order to form a contract. *See Bazemore v. Jefferson Capital Sys., LLC*, 827
26   F.3d 1325, 1330 (11th Cir. 2016) (citing Ga. Code Ann. § 13-3-1:""[t]o constitute a valid contract,
there must be parties able to contract, a consideration moving to the contract, the assent of the parties
27   to the terms of the contract, and a subject matter upon which the contract can operate.")

4

browsewrap-type agreement, which lacks such an acknowledgment, will depend upon whether the website's design and content would put "a reasonably prudent user on inquiry notice of the terms of the contract." *Id.* at 1777. The conspicuousness of the terms and notices, as well as the overall design of the webpage, will contribute to the determination that a user was on inquiry notice. *Id.* (citing cases).

Defendants have not offered evidence explaining the design and content of the webpage or how the AMA appeared on the PFA website. The Court cannot determine whether the terms of the AMA appeared on the registration page itself, or if a user would have had to click a link to see the full terms. Likewise, the Court cannot determine other factors that might contribute to determining plaintiffs' notice of the terms, such as the size of the font or other aspects of the appearance and presentation of the terms online. The declaration of Steven Early does not provide evidence to show that: (1) either of these plaintiffs had actual knowledge of the arbitration agreement; or (2) whether the AMA was a clickwrap or a browsewrap agreement, how the website was designed and where these terms appeared, and whether associates assented by clicking an "I agree" box, or were deemed to agree by continuing in the registration process. Early simply states that: "PFA's software will not allow the new marketing associates to begin the process of becoming appointed by PFA's insurance providers without electronically signing the AMA." Gonzalez's declaration states that the PFA website did not include a checkbox or prompt for agreement to the terms of the AMA. (Gonzalez Decl., Dkt. No. 50, ¶ 4.)[6]

Given the lack of evidence of how PFA's Associate registration process appears and functions on its website, plaintiff Gonzalez's declaration that he did not see an arbitration

---

[6] Gonzalez's declaration states:
PFA's online hiring process did not put me on notice of an arbitration policy. I was not provided with any version of the rules of the American Arbitration Association, nor told about dispute resolution with the American Arbitration Association at any time. When I joined this scheme in January of 2018, to the best of my recollection, there was no online prompt, selection, or check box by which I was required to agree to any marketing agreement or electronically assent to any agreement.
(*Id.* ¶ 4.)

1   agreement, and the reasonable doubts and inferences that must be drawn in his favor under the

2   applicable standard, Gonzalez has raised a genuine issue of fact concerning his notice of, and assent

3   to, the arbitration agreement here.[7]  The Court cannot find that he was reasonably on notice of the

4   agreement to arbitrate, and the motion to compel must be denied.  *See Nguyen.*, 763 F.3d at 1173

5   (holding plaintiff did not assent to terms of service of which he did not have reasonable notice);

6   *Three Valleys*, 925 F.2d at 1141 ("Only when there is no genuine issue of fact concerning the

7   formation of the agreement should the court decide as a matter of law that the parties did or did not

8   enter into such an agreement."). Thus, the motion to compel arbitration fails for lack of a showing

9   of a valid agreement to arbitrate.[8]

10          Accordingly, the Motions to Compel Arbitration are **DENIED**.

11          This terminates Docket Nos. 39 and 46.

12          **IT IS SO ORDERED.**

13   Date: January 22, 2019

14                                                   _____
     **YVONNE GONZALEZ-ROGERS**
     **UNITED STATES DISTRICT COURT JUDGE**

---

24      [7]  Defendants have indicated that they cannot locate plaintiff Chen in their records at all.  It
25   follows that there is no evidence that Chen entered into an agreement to arbitrate any claims here.

26      [8] Because the Court finds that the motion fails on these grounds, it does not reach the
     additional issues of choice of law, lack of mutuality of obligation, and unconscionability raised by
27   the parties.