**Pages 1 - 34**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: PFA INSURANCE MARKETING )
LITIGATION.                     )
                                )   **NO. 18-CV-03771-YGR**
                                )
_____ )


                         Oakland, California
                         Tuesday, January 23, 2024

               **AMENDED TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiffs:

                    GIRARD SHARP, LLP
                    601 California Street, Suite 1400
                    San Francisco, CA 94108
               BY:  **DANIEL C. GIRARD**
                    **JORDAN ELIAS**
                    **SEAN P. GREEN**
                    **ATTORNEYS AT LAW**


For Defendants:

                    COBLENTZ, PATCH, DUFFY & BASS, LLP
                    One Montgomery Street, Suite 3000
                    San Francisco, CA 94104
               BY:  **TIMOTHY P. CRUDO**
                    **ATTORNEY AT LAW**

                    ALSTON & BIRD
                    560 Mission Street, Suite 2100
                    San Francisco, CA 94105
               BY:  **ROBERT D. PHILLIPS, JR.**
                    **TANIA L. RICE**
                    **ATTORNEYS AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

| | |
|---|---|
| 1 | <u>**Tuesday - January 23, 2024**</u>                                                    <u>**2:54 p.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | **THE COURT:**  All right.  Good afternoon, everyone. |
| 5 | **VOICES:**  Good afternoon. |
| 6 | **THE COURTROOM DEPUTY:**  Please be seated. |
| 7 | Good afternoon.  Calling the matter of 18-CV-03771 |
| 8 | -YGR, In Re: PFA Insurance Marketing Litigation.  Parties |
| 9 | please step forward and state your appearances for the record. |
| 10 | Lecturns, please.  Thank you. |
| 11 | **MR. GIRARD:**  Good afternoon, Your Honor.  This is |
| 12 | Daniel Girard appearing on behalf of class counsel.  With me to |
| 13 | my right is Jordan Elias, and to my left, Shawn Greene. |
| 14 | **THE COURT:**  Good afternoon. |
| 15 | **MR. LINDEMANN:**  Good afternoon, Your Honor.  Blake |
| 16 | Lindemann appearing on behalf of Wenjian Gonzalez, Rui Chen and |
| 17 | Mr. Evan Chan.  Thank you. |
| 18 | **MR. CRUDO:**  Good afternoon, Your Honor.  Tim Crudo, |
| 19 | C-r-u-d-o, for PFA. |
| 20 | **THE COURT:**  All right.  Good afternoon. |
| 21 | **MR. PERLA:**  Good afternoon, Your Honor.  For Life |
| 22 | Insurance Company of the Southwest, Timothy Perla, Bo Phillips |
| 23 | and Tania Rice. |
| 24 | **THE COURT:**  Okay.  Good afternoon. |
| 25 | All right.  We're here on a motion for final approval |

```
1    of a class action settlement and the motion for attorney's fees
2    and also objections.  I have a number of questions, but why
3    don't we go ahead and start with the objections, Counsel.  I
4    have three objections that were filed, one for Wenjian
5    Gonzalez.  And being particularly sensitive to the last name
6    Gonzalez, I'll note that the name has been spelled both ending
7    with an "S" and with a "Z".  Am I correct that "Z" is the
8    proper spelling, and that there is no distinction between those
9    two, that there are, in fact, typos?
10            MR. LINDEMANN:  You are correct, Your Honor.  That
11   was a typo.  Apologies for that.
12            THE COURT:  Okay.  Second, Rui Chen, and that's
13   spelled R-u-i C-h-e-n.  Again, there have been two different
14   approached to spelling this name.  I believe it is the same
15   person.  R-u-e Chen and R-u-i Chen, is that the same person?
16            MR. LINDEMANN:  It is, Your Honor.
17            THE COURT:  Okay.  And then the last is Evan Chan,
18   C-h-a-n, Evan spelled E-v-a-n.  Is that correct?
19            MR. LINDEMANN:  That is correct, Your Honor.
20        (Reporter clarification.)
21            THE COURT:  The last spelling is E-v-a-n, Evan, Chan,
22   C-h-a-n.
23            All right.  With respect to Gonzalez and Chen,
24   C-h-e-n, my understanding is that they opted out of the
25   settlement; is that correct?
```

1      **MR. LINDEMANN:** They did submit an opt-out form, Your

2 Honor, and we did file a motion to extending the date by which

3 they could either submit a claim or opt out.  But you are

4 correct, that's currently the posture of their status.

5      **THE COURT:** So because they've opted out, they don't

6 have standing to object.

7      **MR. LINDEMANN:** Your Honor, I think that we have

8 standing with respect to fees, but I agree objecting to the

9 settlement is probably correct.

10      **THE COURT:** All right.  Would they have standing to

11 object to the fees if they don't have standing to object to the

12 settlement?

13      **MR. LINDEMANN:** It's my understanding there's Ninth

14 Circuit authority on that point, but at the same time, because

15 we have Mr. Evan Chan, who's still here, then it's probably a

16 distinction without a difference.

17      **THE COURT:** All right.  So are you withdrawing it, or

18 are you going to tell me what the Ninth Circuit authority is?

19      **MR. LINDEMANN:** Your Honor, I don't recall the case.

20 And I don't like saying that to Your Honor, but I believe I

21 have seen a case saying that, that you can --

22      **THE COURT:** And you didn't cite any authority in your

23 papers.

24      **MR. LINDEMANN:** Agreed.

25      **THE COURT:** And we're here to deal with this.  So is

```
1    it withdrawn or not?

2         MR. LINDEMANN:  Your Honor, as to those two parties,

3    if they're opted out, you know, and the Court finds that

4    they're opted out, then, and is not going to approve our motion

5    to extend the date to do that, then they cannot make the

6    points, and that's fine.

7         THE COURT:  Okay.  I already denied the motion, and

8    that was denied back in October 2023.  There was no motion for

9    reconsideration, so I don't know what the basis would be for me

10   to retract my former denial.  I didn't even consider it because

11   it wasn't requested and it wasn't briefed.

12        MR. LINDEMANN:  Understood, Your Honor.  I'm just

13   bringing up they did file objections in connection with these

14   proceedings.  If the Court is saying that because they've opted

15   out, then they have to proceed with their claims, that's fine.

16        THE COURT:  All right.  So last, then, with respect

17   to -- so the only objection, then, that I have relates to the

18   one filed by -- or the only appropriate objection, by Evan

19   Chan.

20        MR. LINDEMANN:  That is correct, Your Honor.

21        I wanted to clarify one point.  With the other two

22   plaintiffs, they did object to preliminary approval, which I

23   think they did have standing to do.  I know those rulings may

24   carry forward to this final approval, but I just did want to

25   point that out for the record.  They did have standing, they
```

1    objected on some of the same grounds we objected on for final

2    approval, and I wanted just to be clear that that was their

3    position before they had opted out.

4          **THE COURT:**  Okay.  Do you wish to be heard on

5    Mr. Chan's objections?

6          **MR. LINDEMANN:**  Yes, Your Honor.

7          I think a lot of the objections carry over from when

8    there was an objection by Ms. Chen and Ms. Gonzalez based on

9    preliminary approval.  I think there are just a few points that

10   we wanted to raise.

11         First, it does not appear that the release is

12   coterminous with the parties and claims to be released.  There

13   were never any federal RICO claims.  There were never any

14   federal securities claims.  Those are at issue in our operative

15   complaint before this Court.  So I think it would be

16   inappropriate to release any claims that are being brought by

17   us but were not brought by class counsel.  They were only

18   brought solely state law claims, and it's fair to say those can

19   be released on a class-wide basis.

20         In addition, Your Honor, the two plaintiffs who have

21   opted out, each had employment claims, and the release

22   potentially impacts PAGA claims.  I think it should be clear

23   that any claims that are not reasonably subsumed within the

24   class action should not be released.  And so our position would

25   just be as to the release, that it be coterminous with the

1    actual claims at issue in the case or reasonably certain
2    thereto.
3            As to the parties, we would have brought claims
4    against several other insurance entities.  The class notice
5    that went out only deals with Life Insurance Company of the
6    Southwest specifically in both the class notice for the
7    violation terminating class and the ones that are not having
8    their policies terminated.  We believe that's one insurance
9    company.  There are several other related and affiliated
10   insurance companies that should not be released, because the
11   class didn't receive notice of releasing anybody other than
12   Bermuda Financial and Life Insurance Company of the Southwest.
13           THE COURT:  All right.  Do the defendants wish to be
14   heard on that topic in terms of the release?  Mr. Crudo?
15           MR. CRUDO:  Not from PFA.
16           THE COURT:  I can't hear you, sir.
17           MR. CRUDO:  Nothing from PFA, Your Honor.
18           THE COURT:  Anybody else?
19           And before I hear from Mr. Girard, I don't know
20   that -- and this will come up in a different context, as well,
21   but I don't know that I have anything in the record from Evan
22   Chan that they are actually a class member.  That is that:
23   One, they enrolled as a PFA associate; two, that they paid the
24   $125 fee; three, that they purchased a living life policy
25   between January 1st, 2014, and March 17th, 2023; and four, that

1  they did not reach certain positions at PFA.

2          So, one, am I right it's not in the record?  And two,

3  even so, are those elements of a class member met?

4          **MR. LINDEMANN:**  Your Honor, to the best of my

5  knowledge, the elements are met, but to answer your first

6  question, it wasn't specifically in the record.  I believe it's

7  undisputed, though, that this individual is a member of the

8  class.

9          **THE COURT:**  Is that true?

10          **MR. GIRARD:**  That's not true.  We pointed it out in

11  our papers that they had -- they had not established standing

12  in accordance with the Court's preliminary approval order.  So

13  we were going to preserve that objection which the Court has

14  already raised.

15          **THE COURT:**  So why didn't you file anything that

16  established Evan Chan's class standing?

17          **MR. LINDEMANN:**  Your Honor, when I had received some

18  of the paperwork, that was enough that he had signed with PFA

19  and paid the money, I had reviewed that myself.  But other than

20  that, our position was he's a class member, and this is the

21  first I'm hearing --

22          **THE COURT:**  Well, not the first right now, right?

23  Because, Mr. Girard, you said that this was in the -- that this

24  was in the briefing?  You said this was in the briefing?

25          **MR. GIRARD:**  It is, Your Honor, the point about a

1  lack of standing.

2          **MR. ELIAS:**  Correct, Your Honor.  Jordan Elias.

3          **THE COURT:**  You need to speak in the mic.  I don't

4  have a court reporter here.

5          **MR. ELIAS:**  Apologies.  Jordan Elias for the

6  plaintiffs.

7          Yes, the notice indicated the four elements that Your

8  Honor mentioned for establishing class membership, and there is

9  nothing in the record with respect to any of those from Evan

10  Chan.  We have noted that in our briefing and preserved the

11  objection.

12          **THE COURT:**  So did you read the brief, given your

13  objections?

14          **MR. LINDEMANN:**  Your Honor, it's my understanding,

15  and so they reserved the right.  We can submit something

16  correcting it.  He was somebody signed up for PFA.  This is not

17  somebody didn't lose money through PFA, so ...

18          **THE COURT:**  Did he receive the notification?

19          **MR. LINDEMANN:**  Did he receive the class

20  notification?  I don't know if he did.  I don't know if he did.

21  Disseminated from the claims administrator?

22          **THE COURT:**  Yes.

23          **MR. LINDEMANN:**  I don't know.  I don't know.  I just

24  know that I saw the paperwork that he did sign up for PFA, and

25  he paid the money.

1      **THE COURT:**  That's not very thorough.  Did he buy a

2  policy?  Did you see the policy?

3      **MR. LINDEMANN:**  Yes, he did, Your Honor.

4      **THE COURT:**  Did you see the policy?

5      **MR. LINDEMANN:**  I just saw the paperwork that he had

6  paid for the policy.

7      **THE COURT:**  And did you check the date?

8      **MR. LINDEMANN:**  Yes.  It's my understanding he

9  started being involved in PFA in 2017.

10      **THE COURT:**  Well, there are only three months --

11  well, 2017.  Oh, you're right.

12      In California?  Where does he live?

13      **MR. LINDEMANN:**  He's in California.  He's in Los

14  Angeles.

15      **THE COURT:**  Does nobody have -- do plaintiffs not

16  have that informations, Mr. Girard?

17      **MR. GIRARD:**  We have new information that he bought a

18  policy.  What we don't have is the information that he

19  purchased it in California and that he never achieved any of

20  the levels in the hierarchy that are excluded under the terms

21  of the settlement, which were all components of the showing of

22  standing that he was required to make.

23      **THE COURT:**  Response?

24      **MR. LINDEMANN:**  Your Honor, I think they said we're

25  not sure one way or the other, so my understanding from him is

1    that he was not one of the upper-level people.  You know, my

2    response is they admitted he's part of the class.  He purchased

3    a policy.

4             **THE COURT:**  Where do you get the admission?

5             **MR. LINDEMANN:**  Mr. Girard just said he purchased a

6    policy.

7             **THE COURT:**  There's more than one element to be a

8    member of the class.

9             **MR. LINDEMANN:**  Understood, Your Honor, and --

10            **THE COURT:**  I'm asking you, where do you get your

11   notion that there's an admission.  I mean, they've already

12   noted an objection.

13            **MR. LINDEMANN:**  Your Honor, from the perspective of

14   the fourth element, I can just tell you what I've been told,

15   and I did answer you when you asked is there anything in the

16   record that says that, and I said, no.  So there's nothing -- I

17   believe that he meets all elements of, but I -- there's nothing

18   in the record, as I've already said, to suggest that.

19            **THE COURT:**  Mr. Girard, you wanted to be heard on the

20   nature of the release?

21            **MR. GIRARD:**  Yes.  So the objection that he's raised

22   going to the other companies within the defendant's corporate

23   families is new.  That's not in the briefing.  We're checking

24   on this, but I'm fairly certain that the release language will

25   define them within the scope of the released parties.

1            On the broader issue of the scope of the release,

2     these are the same objections that he raised at preliminary

3     approval that we responded to, identified this release as being

4     drawn within the identical factual predicate doctrine.  Your

5     Honor considered that authority, and it ruled that this release

6     was appropriately tailored.  Because it is tailored to the

7     facts that were or could have been raised in this action, it is

8     within the Court's power to release claims that were not

9     actually released in this case, and we cited authority which

10    Your Honor acknowledged.

11            **MR. ELIAS:**  Your Honor, Jordan Elias.  If I could

12    just add on the issue of the definition of the defendant

13    release parties, those are the parties subject to the release.

14    That is defined in the settlement as PFA LICS, and each of

15    their respective related persons.  And related persons, as is

16    customary, is defined in provision 2.23 of the settlement as:

17    In its present form are immediate family members, heirs,

18    executors, trustees, administrators, successors, assigns, and

19    so on and so forth.

20            **THE COURT:**  Well, what if he opts out?  Isn't that

21    the point, that it's not released as to him?

22            **MR. GIRARD:**  That's correct, Your Honor.

23            So the other thing I wanted raise, and this is a

24    development, we have -- we consulted with the defendants as to

25    Gonzalez and Chen, C-h-e-n.  Notwithstanding the fact we think

```
 1    their objection or their opt-outs were late, we do not object
 2    to them opting out.  And so if we get to the point where Your
 3    Honor's prepared to enter a final approval order, we're
 4    prepared to tender a definitive list of opt-outs.  There are a
 5    few other stragglers which defendants have agreed to include.
 6    So the total list will include 132 individuals who wish to opt
 7    out, including Gonzalez and Chen, C-h-e-n.  He did not seek to
 8    opt Chan, C-h-a-n, out, so the same point doesn't come up
 9    there.  But the point being that Gonzalez and Chen do not have
10    standing to object to final approval or the fee application.
11         THE COURT:  All right.  What else do you want to be
12    heard on?
13         MR. LINDEMANN:  Your Honor, just one brief point in
14    reply.  Typically when have a class notice, it will say you're
15    releasing the parties as set forth in the settlement agreement.
16    This class notice does not.  There are two class notices
17    specifically says the only people to be released is one
18    insurance company and PFA.  And the reason that's important is
19    because counsel's reading from a settlement agreement that the
20    class did receive.  Usually, the class notice will specifically
21    refer to who's being released so somebody could look and be on
22    inquiry notice.
23         The next point I had, Your Honor, putting that aside,
24    is we're all concerned that this settlement may violate the
25    class notice.
```

1          **THE COURT:**  Can I ask you, what authority exists for

2    you to raise new issues?  I mean, this has been pending for a

3    while, and all of a sudden you have a brand new issue that was

4    never raised.

5          **MR. LINDEMANN:**  I think generally we objected to a

6    scope and form of notice, and then the objection filed by the

7    three plaintiffs, and --

8          **THE COURT:**  How am I supposed to read your mind?

9          **MR. LINDEMANN:**  Your Honor, I don't expect you to

10   read my mind.  I'm just looking at this from the perspective of

11   the class, and I'm making the points I can.  And I -- I believe

12   we did object to the form and scope of notice, we objected to

13   the release.  So these are not new issues in terms of that, but

14   I'm bringing up more nuanced points as to why I think there are

15   problems.

16         **THE COURT:**  So what do I call this, a lack of

17   preparation?

18         **MR. LINDEMANN:**  Your Honor, you can characterize me

19   however you want.  I brought this case in good faith in 2018.

20   I believe in it.  I'm here now.  It's a troubling situation,

21   but I'm here now, and you can characterize however you want.

22   I'm just doing the best I can to preserve what I believe is a

23   valid claim, and I believe what's happened here is not

24   reasonable, fair or adequate when you look at the Rule 23

25   standard.

1       **THE COURT:**  Why do you say that?  I mean, there have

2    been thousands of class members who haven't objected.

3       **MR. LINDEMANN:**  We've had several people contact us

4    who wanted to -- wanted representation when class notice was

5    sent out.  We elected to proceed in the way we're proceeding.

6    But I don't think the reason I'm going to discuss this is a

7    fair deal that the class received notice of.  It is not a fair,

8    reasonable and adequate deal on its face.

9       **THE COURT:**  All right.  List.  What are -- and I have

10   to tell you, I don't even know that I'm going to consider it,

11   because I find your approach to be procedurally improper and

12   certainly not timely.

13      **MR. LINDEMANN:**  Your Honor, I understand your point.

14   I don't want to argue with you.  I'm just telling you that I'm

15   making other points as I see it when I prepared for today,

16   and --

17      **THE COURT:**  Yeah, but this has been -- this motion

18   was filed a considerable amount of time ago.  You've had plenty

19   of opportunity.  You filed something and didn't identify these

20   things specifically, and --

21      **MR. LINDEMANN:**  Some of these things did come up,

22   though, when we received who claimed in in the class

23   memorandum.  Right?  So when class counsel filed the memorandum

24   in support of approving this on a final basis, then we learned

25   about who's claimed in and things like that.  So it does relate

```
1    to what has happened since our objection deadline.
2              THE COURT:  I need a list.
3              MR. LINDEMANN:  Okay, Your honor.  I appreciate that.
4    When you say you need a list, do you want me to --
5              THE COURT:  Do you have something to assist --
6              MR. LINDEMANN:  Yes.
7              THE COURT:  So tell me what the list is.  I'll tell
8    you if I want argument.
9              MR. LINDEMANN:  Okay, Your Honor.
10             So the first point is we're concerned that the
11   settlement violates the class notice.  On page 5, it
12   specifically excludes all representatives, successors and
13   assigns.  We think many of the people that claimed into this
14   settlement, which we have not had a chance to object to, are --
15   qualify as being automatically excluded as representatives,
16   successors and assigns of the individuals at the top of the
17   pyramid scheme.  Again, we would have no way to object, because
18   the claim -- our objection deadline is before the claims were
19   made.  That applies to both the active and inactive notice.
20             This is not a case to depart from Rhapsody.  A
21   reverse auction is not meriting in good faith, particularly in
22   light of the concerns that the proposed settlement payments to
23   class members violate the class notice.
24             There's a reliance on California law, yet they seek a
25   national release.  They can't get around Rhapsody that way.
```

1   The law is pretty clear.

2          Turning to your actual consideration -- and we did

3   point this out in objecting to preliminary approval and in

4   objecting to final approval -- that the consideration was

5   inadequate.  We did raise that.  Specifically, the cash

6   surrender value of the policies are greater than what somebody

7   would get by claiming in.  That's paragraph 10 of the active

8   policy.

9          So this creates, in effect, a Hobson's choice.  You

10  don't claim in and you give a release, or you claim in and you

11  get less than the face surrender value of the policy.  When you

12  subtract all the costs and the percentages are dribbled down,

13  this is not a good deal for anybody, and I believe the people

14  that claimed in are people that should be automatically

15  excluded under page 5 of the notices.

16         It's also unfair because the cash surrender value is

17  subtracted by a whole host of unidentified costs.  There were

18  significant costs that go into that calculation, and in effect,

19  class members don't even receive their surrender value if they

20  were just to decide to terminate.

21         As for the policies that are already gone that are

22  considered terminated, those people get a fraction on the

23  dollar.  They start at two-thirds, and you take off 25 percent.

24  Then you take off a series of costs.  So they're effectively

25  giving a release and getting very little, when they could

```
1   simply surrender and get the cash value back, even if their
2   policy was terminated.
3           The business practices at 356-3 are not reasonable.
4   Notably, there is no reference to dimensioned or lessening of
5   recruiting or illegal pyramid scheme conduct.  The only new
6   business practice is to create a policy at a applier level
7   whereby less representations would be made about trips,
8   rewards, lavish lifestyles, but that doesn't solve the ultimate
9   problem of why this case was filed, why we filed the case, and
10  our belief is that those changes are illusory.
11          In short, Your Honor, for those reasons, and those
12  are the only points we have an objection, we think that this
13  settlement requires additional scrutiny.  It requires
14  additional notice to class members as to exactly what they're
15  getting.  We think as to the people that did file a notice,
16  they should be automatically excluded, because they're related
17  to the higher level of the pyramid scheme.
18          THE COURT:  But what is the factual basis for your
19  assumption?
20          MR. LINDEMANN:  Your Honor, this is information that
21  we've heard from people who are part of this scheme.  This is
22  not something that I provided evidence of.  And it's also based
23  on the definition in the class notice.  The class notice
24  specifically lists any representatives of the foregoing, and I
25  have it on good information that some of the representatives of
```

```
1   the people who are running these schemes are claiming in
2   significant dollar amounts.  I don't have the actual claims,
3   but this is the information I've received.
4           THE COURT:  Who are they?
5           MR. LINDEMANN:  Who are they who?
6           THE COURT:  Who are these people that you're talking
7   about?  Do you have names?
8           MR. LINDEMANN:  I received that information from Evan
9   Chan.
10           THE COURT:  So who are they?
11           MR. LINDEMANN:  Who are the people who --
12           THE COURT:  If you have names, I'd like the names.
13           MR. LINDEMANN:  Your Honor, I don't have authority to
14   disclose that, and I'm just being candid with you, because they
15   are friends of people, and I don't have authority to disclose
16   that.
17           THE COURT:  Well, you can disclose it, or I can
18   ignore it.  I can't have it -- you can't have your cake and eat
19   it, too.
20           MR. LINDEMANN:  I think the key is I don't agree it's
21   that finite.  I think that the ultimate fact is that the class
22   notice says the settlement excludes representatives,
23   successors, assigns of these individuals, and we believe that
24   the settlement, the claims filed, if we were to get into that
25   and be entitled to discovery, which we request, would show that
```

1   these claims are being made by people who are affiliated with

2   these people that are supposed to be excluded.  You are

3   correct, Your Honor.  There is no evidence in the record of

4   that, and I'm being very clear and being very candid, but I do

5   believe I'm entitled to discovery on this, and I do believe

6   that --

7          **THE COURT:**  Only if you had a factual basis, and you

8   refuse to give me one.  And maybe not even then, but you don't

9   even get the door open if you don't give me evidence.

10          **MR. LINDEMANN:**  Your Honor, I think that the good-

11   faith basis is how the notice is defined in the actual class

12   notices.  Again, they worded the class notices to say if it's

13   anybody who is a representative, successor, assigned of various

14   individuals, and our position is we've made clear that this is

15   an issue we did raise in opposition in Mr. Chan's opposition.

16   So I did want to be clear.  And similar to points we had

17   specifically raised, but this wasn't one we raised.

18          So that's what I have unless the Court has any

19   questions.

20          **THE COURT:**  In your objection I don't recall seeing

21   any of this.

22          **MR. LINDEMANN:**  So the release issue is at page 5

23   to 6.  The consideration inadequate, which goes to these issues

24   that I raised before related to this is a bad deal for

25   everybody is at page 6, paragraph B.  The release provision is

1   further described at page 8.  We did raise it.  As for the

2   final point, I believe we added a sentence or two, but I know

3   we didn't flesh it out other than that.

4          **THE COURT:**  What was your issue with errors and

5   assigns?  It's a sentence, you're telling me?

6          **MR. LINDEMANN:**  Correct.  I did not raise that

7   specifically in these papers as to the problem with the class

8   notice.  On that point we did not.

9          **THE COURT:**  Well, I don't understand why you're

10  saying that's a class notice issue.  That is, I thought your

11  objection was that there were people who fell within that group

12  who should have been excluded.  And so it's an administration

13  issue, not a class notice issue.

14         **MR. LINDEMANN:**  I think it's a notice issue because

15  it goes to the fairness and adequacy or lack thereof of

16  settlement.  In other words, if these people are colluding with

17  the founders of these companies --

18         **THE COURT:**  Well, what I thought you were saying is

19  that under the terms of the agreement they're not supposed to

20  be members.

21         **MR. LINDEMANN:**  Correct.

22         **THE COURT:**  So it's not a notice issue.  It's an

23  issue of who's being placed in the class.

24         **MR. LINDEMANN:**  That's correct.

25         And I do think it raises that additional issue as to

1    whether the people should be in the class, correct.  But I do

2    think it goes, when you look at who made those claims, I think

3    it's going to show the overall unfairness, as well, as to why

4    this settlement was done, which is a claim and settlement

5    effectively for attorney's fees.

6            THE COURT:  Mr. Girard?

7            MR. GIRARD:  An issue about assigns I don't think was

8    raised.  If I understand, I think I understand it the same way

9    the Court does, which is he's, I believe, saying that there are

10   people that should be excluded that have filed claims under the

11   settlement, but he hasn't identified who any of those people --

12           THE COURT:  Well, did the administrator ask

13   whether -- especially given the allegations in this complaint,

14   did the administrator ask whether the individuals were

15   successors, assigns or heirs of excluded individuals?

16           MR. GIRARD:  No, because that's not their function.

17   These people all submitted the certification that was required

18   on the claim form, and that's how the parties agreed to settle

19   the case.  And so --

20           THE COURT:  So how are you enforcing the provision of

21   the settlement agreement?

22           MR. GIRARD:  The -- it's enforced by that

23   certification, and even -- I mean, from his clients' point of

24   view, or from the Court's point of view, this carve-out was

25   designed to manage a potential conflict whereby people who were

higher up in the hierarchy would have interests that were at

odds with those of the lower-level people who were victimized

by the sales operation.

**THE COURT:** And my question is:  How do you know that

everybody who has submitted a claim falls within that

victimized group, as opposed to connecting with the leadership?

**MR. GIRARD:** We know two ways.  One is we know the

names of the people that are the most prominent, because those

names appear in promotional materials, and a lot of these

people fall within that group.

Second, to the -- the record in the case is that the

defendants didn't maintain records of who had what title at

particular points in time, and the parties agreed -- this was

part of your certification order -- that individual affidavits

or submissions, certifications by participating class members

would be sufficient to address that point.

Ultimately, it doesn't -- if someone who somehow

falsified that certification participated, it wouldn't take the

money away from anybody else.  It would simply mean that the

defendants were going to compensate someone who would have

otherwise been carved out, but it's not as somebody detracting

from the overall recovered.

**THE COURT:** Address the issue regarding the amount

that's being paid and whether or not class members in a sense

are worse off than if they just requested the cash surrender

1    value for the policies.

2            **MR. GIRARD:**  So there's two situations here.  One is

3    a situation where a person has a positive cash surrender value,

4    and that positive cash surrender value exceeds the amount of

5    the settlement payment they would get.  We've discussed that at

6    length in both the preliminary approval order and the

7    supplemental submission that we made to Your Honor.  We

8    estimated -- well, we provided specific numbers on that.  It's

9    approximately 16 percent of the class.

10           That's -- the reason they have that positive cash

11   surrender value is either that they paid premiums substantially

12   in excess of what they were required to pay to maintain the

13   policy, which was an indication that they believed in the

14   policy, they wanted to invest into it, and/or some combination

15   of that plus the fact that the index performance, which is the

16   component of this policy that's tied to market performance,

17   performed well for them.

18           So we explained in our submission and Your Honor

19   recognized that those people haven't been injured.  They're not

20   the targeted people.  That's approximately 16 percent of the

21   class.  And we've determined that none of the people who have

22   made claims will fall within that group, and there are no

23   objections by any person who does fall within that group to the

24   approval of the settlement.  And that's understandable, because

25   they don't consider themselves victimized.

1          And Mr. Lindemann's client, Evan Chan, if he did have

2     standing, is not such an individual, and Mr. Lindemann is

3     attempting to raise the rights of other persons other than his

4     own client.

5          Separately, in terms of the people who do not fall

6     within that group, you have extensive submissions we have made

7     to you about the actual recoveries.  I can provide more

8     information if you'd like it.  It's all in our briefing in

9     support of final approval.

10          The current list of class members who have made

11     claims, the number is 1015.

12          **THE COURT:**  115 or 1015?

13          **DEFENDANT'S ATTORNEY:**  1015.

14          There were a few late claimants that the defendants

15     agreed to accommodate in the interests of finality, and when we

16     submitted our final approval papers there were still a few in

17     the system, and that's why that number is going to be 1015.

18     The approximate total recovery to those people is $4,241,000,

19     and that's involving 1387 policies.

20          We have a few letters from people who support the

21     settlement; a thousand people who stand to benefit from this

22     settlement if it's approved.

23          **THE COURT:**  So there are some other -- you can sit

24     down, Mr. Lindemann.

25          **MR. LINDEMANN:**  Thank you, Your Honor.

1          **THE COURT:**  There are some other specifics that I

2    need clarity on, and especially given the objections.  I think

3    they need to be filed on the docket with the appropriate

4    certifications.

5          One is that the class administrator said that there

6    were 16,000, or they mailed -- had about 16,000 potential class

7    members, and yet all of the briefing that was filed with

8    respect to this final approval said 13,000.

9          **MR. GIRARD:**  Right.

10          **THE COURT:**  So I have the lawyers make

11    representations to the Court not consistent with what the

12    administrator is telling the Court.

13          **MR. GIRARD:**  Well, can I respond?

14          **THE COURT:**  I'd like you to respond on that, because

15    it concerns me.

16          **MR. GIRARD:**  Yeah.  What happened there is that we

17    explained in our papers that the 16 was the total number and

18    subtracted from that the people, the positive CSV people we

19    call them, with a positive cash surrender value, and that for

20    purposes of the people who would be interested in making a

21    claim because they stood to recover from the settlement, as

22    opposed to those who were people that have a positive cash

23    surrender value, if you subtract that number out, you get the

24    13,000.

25          We also excluded that there were a number of very

1   similar last names here and that we think there was some

2   duplication.  There's also some number of people who rose to

3   the point in the pyramid where in our own structure they would

4   have been excluded.  So we thought 13,000 was a pretty good

5   estimate of how many people were actually eligible to make a

6   claim in the sense that they would have a positive recovery

7   under the settlement.

8         So to complete that, we've got some additional

9   addresses at the point right before the claims administrator

10  was prepared to mail it.  So ultimately the claims

11  administrator received around 17,000 addresses.  We don't think

12  it changes the numbers appreciably, though.

13        **THE COURT:**  I would have to go back and check.  My

14  notes indicate that your -- that the representations being made

15  said that there were, quote, at most, closed quote, 13,000

16  class members, which included, not excluded, this positive cash

17  surrender value set of people, and then I've got the 16,000.

18  And this is -- and understand the concern is in part because

19  this is this rare case where plaintiffs' lawyers are asking for

20  millions of dollars more than the class is getting.  Now, I

21  know it's not the same pool, but it does concern me, and

22  there's Ninth Circuit authority that I need to consider --

23        **MR. GIRARD:**  I understand.

24        **THE COURT:**  -- when lawyers ask for millions of

25  dollars more than class members receive.

1        **MR. GIRARD:**  It's 1.8 million more than the class

2    members are receiving.

3        And so I don't know if you want -- which direction

4    you want me to go.  I can argue on the fees.  I can offer to

5    clarify the briefing.  I think I can point you to specific

6    places, if we have five minutes to track it down, where we went

7    through these numbers.  I think we were pretty careful to

8    explain what we were dealing with in terms of the total list.

9        The problem is, you know, this is not a fixed group

10   in the sense that it's dynamic, and there are some unknowns in

11   terms of which people fell within which categories, and it

12   changes over time because these people are making payments on a

13   constant basis as to the active group.  We've provided you

14   plenty of evidence in terms of how we estimate the claims in

15   relation to the total amount of class members.  We're fairly

16   consistent with our estimates overall and the estimates that

17   the Court acknowledged in its preliminary approval.

18       Ultimately, you had mentioned the Ninth Circuit

19   authority.  Yes, it's true that the fee here we're seeking is

20   in excess of the total payout, but I think that the total

21   payout here is probably more, given all of those Ninth Circuit

22   cases you're concerned about put together.  I don't know that

23   for a fact, but I will note most of those cases didn't involve

24   anything close to $4.2 million.

25       **THE COURT:**  So if you have -- and I did the math

1  based upon the last set of numbers.  So at the time of the

2  briefing there were 998 claims, which, if I'm using the measure

3  of 1300 class members, or 13,000, then the participation rate

4  is 7.6.  If that -- if the class member size is 16,000 as

5  opposed to 13,000, then the participation rate is 6.2 percent.

6  Right?  I mean, am I doing the math right?

7            **MR. GIRARD:**  Yes, but --

8            **THE COURT:**  And in terms of that total pool of what

9  would have been achievable, we are now below 3 percent in terms

10  of the recovery to class members.

11            **MR. GIRARD:**  Of the 66 million, right?

12            **THE COURT:**  Yes.

13            **MR. GIRARD:**  Yeah.  And so let's talk about that,

14  because that's really at the core of what the Court is I think

15  having to address here.

16            So from our perspective, the choice here was to

17  settle this case or to go forward and go to trial.  If we won

18  the case at trial, is there any reason to believe the outcome

19  would have been any different than it was here?  I think the

20  claim number would have been lower, because it's inherent in

21  the nature of the cause of action here under the endless chain

22  law that the recover is one that is recisional, so it requires

23  a decision.  The investment or insurance product that was

24  offered here is an exceedingly complex insurance instrument.

25  The population involved is a group of people who, based on our

1   experience and the record before you, is largely composed of

2   people who are recent immigrants who don't speak English as a

3   first language.

4            The potential of this policy is something that

5   remains at issue, but in this case it provided them with an

6   opportunity to recover, and you have these statistics before

7   you.  On the average, about 45 percent of the premiums they

8   paid in, 45 percent of an amount that they would have recovered

9   if we prevailed at trial.

10           So the reason that the fees are in excess of that

11  $4 million amount, if you go back to our briefing and you look,

12  we showed you how the fees escalated.  And if you go back to

13  the third quarter of 2021, that is when we had the meeting and

14  couldn't get this case settled because we couldn't get an offer

15  that we were prepared to bring to this Court.  So at that point

16  our fees, which are reflected in the chart that we submitted to

17  you, because we've provided prevailing fee summaries as

18  required under the time-keeping protocol, so we had to go

19  through and litigate the case for another year and a half and

20  get through summary judgment and class certification at that

21  point in order to get this case to a point where we could

22  settle it.  So if we had -- if they had agreed to settle it in

23  the third quarter of 2021, we wouldn't have the proportionality

24  problem.

25           So by doing the work and taking the risk, making the

1  investment it took to get to this point, the fees escalated.

2  And it's very clear under California law, which supplies the

3  rule of decision here, that that proportionality should not

4  work against us because the impact would be to penalize us for

5  litigating the case to a point where it could be resolved

6  successfully.

7        And I think the Ninth Circuit law is clear that where

8  the circumstances are exceptional or there are valid

9  justifications for the disparity and the things in the

10 recovery, that it's inequitable to reduce our fee because of

11 that.  And in our view, this is exactly that kind of case where

12 we're limited by the nature of the cause of action to a

13 recisional recover.  We could not divest people of their

14 insurance policies.  The case was further litigated.  We

15 succeeded in overcoming the opposition to class certification,

16 the Ninth Circuit appeal of the certification order, summary

17 judgment motions.  They replaced their highly experienced

18 counsel with new counsel.

19        This case was successfully litigated.  It shouldn't

20 count against us that a vulnerable population reacts in the way

21 it does to a notice that -- you know, you spent a lot of time

22 on this notice yourself, Your Honor, just as we did.  It's as

23 simple as it could possibly be and delivers -- if you look at

24 the amounts individual people are getting in the settlement,

25 you've got 36 people recovering $15,000 or more.  Two of the 30

1   were $25,000.  This is not a case where people were offered a

2   recovery that was not meaningful.  It was in every single case.

3   If you look at the average recoveries, they're in the thousands

4   of dollars both as to the inactive and active policyholders on

5   average.

6          So I think this is exactly the type of case that both

7   California courts and federal law have recognized deserves to

8   be brought.  It's -- our system privatizes the enforcement of

9   these types of events, and to hold us responsible for that

10  disparity, when we don't control the amount of defense spending

11  is to effectively to dissuade us from taking these cases in the

12  future.

13         **THE COURT:**  All right.  What is the anticipated, if

14  it is approved, what is the anticipated timetable for making

15  payments?  Because I always require a post-accounting --

16         **MR. GIRARD:**  I can take you through that.

17         So if you approve the final order, the settlement

18  agreement provides that upon the expiration of the appeal

19  period, the effective date runs.  From the effective date, the

20  claims administrator will have 90 days to cure any deficient

21  claims.  We've identified there are approximately 31 to 35

22  deficient claims.  Defense counsel's been through all the

23  claims, and they are all valid except there's less than 10 that

24  need to be reconciled to be sure there wasn't --

25         (Reporter clarification.)

1        So I was in -- of the claims I've identified, the

2   1015, defense counsel believes are all valid except for a

3   handful that need to be photo verified, but that is effectively

4   it.

5        So we think we can get the jump on curing the very

6   few defective claims, because there's only about 30 or 35, but

7   technically there's a 90-day period that they're allowing to do

8   that.  At the expiration of that 90 day period, they will

9   deliver the valid claim list to the defendants.  The defendants

10  will have 21 days to rescind the policies that need to be

11  rescinded, to calculate the max owed.  They're going to turn

12  over an Excel spreadsheet with all of their calculations to the

13  administrator and then to us so that we can verify those.  That

14  would all be transparent.

15       So that total from final approval to payout would be

16  163 days under that timetable.  I think we can speed it up,

17  because as I indicated, there are not a lot of claims that need

18  to be cured.

19       **THE COURT:**  All right.  Given everything that's going

20  on in this case, I'll be issuing a fulsome written order.  I'm

21  hoping to have it done pretty soon.

22       **MR. GIRARD:**  Can I add anything more from us on this

23  issue of 16,000 versus 13,000?  Because I'm concerned that -- I

24  thought we had addressed that, but obviously we didn't make it

25  clear enough, and I think I can clarify that if it needs to be.

1            **THE COURT:**  Some clarification would be helpful.

2  Thank you.

3            **MR. GIRARD:**  Any particular format, Your Honor?

4            **THE COURT:**  It can just be a short brief, and if --

5  you know, cross citations are fine, but I think, again, it's

6  here in the record, and I would, you know, use the updated

7  numbers, since now we're at 1015 as opposed to 1998.

8            **MR. GIRARD:**  Okay.  And do you want any more argument

9  on the -- do you have any other questions?

10            **THE COURT:**  I understand your perspective.

11            **DEFENDANT'S ATTORNEY:**  Thank you.

12            **THE COURT:**  Thank you.  We're adjourned.

13       (Proceedings concluded at 3:50 p.m.)

14                          **---o0o---**

15                 **CERTIFICATE OF REPORTER**

16       I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  DATE:  Thursday, February 8, 2024

20

21

22  _____

23  Stephen W. Franklin, RMR, CRR, CPE
    Official Reporter, U.S. District Court

24

25